FRANKLIN v. ATLANTA & CHARLOTTE AIR LINE RAILWAY CO.

1. LESSOR AND LESSEE.—A RAILROAD corporation having obtained a charter from the State is liable to a passenger for damages caused by indignities suffered from a fellow-passenger on cars operated on such road by a lessee company.

*Pennington* v. *Ry. Co.,* 35 S. C., 439, *overruled.*

2. EVIDENCE—RECORDS—WRITINGS—MEMORANDA.—A hospital record made by a witness of diagnosis of a patient's ailments when received in the hospital is not admissible as record evidence unless the party offering the record explain the presence of entries which the witness says he did not make, and does not know about, and which were made after completion of record, but the witness may testify from the record as to the statements made to him by the patient and to his diagnosis, when he testifies he made the entries at the time, and if not true he would not have made them, although he is unable to remember the facts outside of the record after refreshing his memory, but diagnosis of any other physician of the hospital by witness would be hearsay.

MR. CHIEF JUSTICE POPE AND MR. JUSTICE GARY *dissent as to the latter clauses.*

3. CHARGE.—After stating issues to jury raised by pleadings it is not error to say to them, you take the pleadings in the room with you, examine them, and see for yourselves what issues they raise.

4. PASSENGERS.—A CARRIER is bound to exercise as high a degree of care to protect a passenger from the wrongs or injuries of a fellow-passenger as it is to observe in order to protect all of the passengers from injury arising from the faulty construction of the railroad track or the faulty movements of its trains, *only* as against those passengers from which it has reason or notice to anticipate improper conduct.

MR. CHIEF JUSTICE POPE *dissents.*

Before KLUGH, J., Greenville, March Term, 1904. Reversed.

Action by Suda L. Franklin and Howard H. Franklin against Atlanta and Charlotte Air Line Railway Co. From judgment for plaintiffs, defendant appeals.

*Messrs. W. A. Henderson* and *T. P. Cothran,* for appellant. *Mr. Cothran* cites: *Lessor railroad is not liable for injury to passengers by lessee road:* 63 S. C., 570; 60 S. C., 209, 390; 61 S. C., 335; 65 S. C., 97; 59 S. C., 544; 35 S. C., 439; 147 U. S., 101; 37 S. C., 380; 65 S. C., 338; 23 Ency., 2 ed., 785; 54 S. C., 505; 62 S. C., 335; 65 S. C., 97, 437; 67 S. C., 358. *As to exclusion of hospital record:* 2 Jones Ev., secs. 323, 324; Green. Ev., sec. 115. *Could the witness state from hospital record entries made by him?* 41 S. C., 149; Green. on Ev., sec. 436; 14 S. C., 450; 2 N. & McC., 331; Green. on Ev., 16 ed., secs. 439a, 439b; 1 Mill, 373, 423; 66 Am. Dec., 714; 7 Sup. Ct. R., 173; 51 Fed. R., 889; 9 Wall., 680; 1 Rich., 234; 113 U. S., 656; 5 How., 294; 38 S. E. R., 908; 14 S. E. R., 752; 164 U. S., 100; 74 Am. Dec., 547; 30 Am. Dec., 137; 10 N. Y., 96; 29 N. Y., 348; 15 N. Y., 485; 35 Vt., 195; 9 Hun., 347; 42 Vt., 206; 1 Keyes, 357; 150 N. Y., 365. *Jury should not be required to read the pleadings to ascertain*

*issues:* 15 S. C., 202; 24 Ency., 2 ed., 552; 3 Wash., 34; 69 Ala., 332; 46 S. C., 104. *Duty of carrier to protect passenger from injuries from fellow-passengers:* 93 N. W., 127; 16 L. R. A., 630; 105 U. S., 252; 140 Mo., 683; Ray Neg., 133, 134; Webb Pollock Torts, 45, 46; 47 L. R. A., 123; Tetter. Car., sec. 98; 53 Miss., 200; 4 Elliott v. R. R., sec. 1629; 6 Cyc., 602; 5 Ency., 2 ed., 553; 93 Va., 44; 2 A. & Eng. R. Cas., 441; 87 Mo., 417; 32 L. R. A., 794; 67 Miss., 376; 38 L. R. A., 431; 8 A. N. C., 92, 9; 30 S. C., 218.

*Messrs. Johnstone & Welch* and *Haynesworth & Parker,* contra. *Messrs. Johnstone & Welch* cite: *Lessor railroad is liable:* 25 S. C., 222; 28 S. C., 401; 43 S. C., 197; 17 Wall., 450. *That the injury was caused by lessee railroad if offered in mitigation of damages should be pleaded:* 85 N. W. R., 621; 69 Am. Dec., 696; 26 N. Y. Sup., 781; 61 Pac., 21; 69 S. C., 1. *Admissibility of hospital record:* Code 1902, 2900, 2901; 63 S. C., 70. *As to liability of a railroad for injury by one passenger to another:* 63 L. R. A., 634. *A written memorandum may be used to refresh memory of witness, but is itself not admissible as evidence:* 14 Cal., 144; 31 Pac., 561; 41 N. W. R., 1043; 40 N. H., 47; 1 Barb., 526; 5 Rich., 495; 41 S. C., 149; 63 S. C., 559; 21 Fla., 555. *Defendant must explain alteration in instrument:* 9 Ency., 2 ed., 925; 132 Mass., 477; 2 Tay. on Ev., 8 ed., 1546; 3 N. Y. App. Div., 353; 6 Coldw., 571; 38 Mo., 70; 13 Am. Dec., 684; 23 Pa. St., 244; 91 Pa. St., 336; 155 Pa. St., 429. *Party cannot contradict a witness as to irrelevant issues:* 10 Ency. P. & P., 294; 1 Green. Ev., sec. 449; 1 Whar. on Ev., 559; 34 S. E. R., 364; 120 Mass., 336; 19 N. H., 351; 75 Am. Dec., 203; 69 Tex., 730; 36 Am. Dec., 359; 22 Ala., 611; 23 Ala., 662; 16 Pick., 153; 75 Am. Dec., 203. *As to refreshing memory:* 41 S. C., 149.

*Messrs. Haynesworth & Parker* cite: *Lessor railroad com-*

*pany is liable for injury to passenger by lessee company:* 63
S. C., 374; 25 S. C., 221; 28 S. C., 401; 17 Wall., 445; 80
N. Y., 29; 57 Am. R., 25; 24 N. E., 559; 71 Tex., 614.
*And lessor is liable for wilful acts of lessee:* 28 S. C., 440;
37 S. C., 380; 69 S. C., 110, 116, 160; 194 U. S., 136.
*Alteration of a record destroys its value as evidence:* 1
Green. Ev., 564, 565; 32 S. C., 240; 14 S. C., 357; 17 S.
C., 466; 19 S. C., 263. *Witness could only testify from
the hospital record by using it to refresh his memory:* 41
S. C., 152; 17 N. Y., 140; 63 S. C., 572. *Witness must
know record to be correct at time:* 1 Whig. on Ev., sec.
747; 17 N. Y., 140. *Excluded evidence could not have
effected the result:* 1 L. R. A., 378; 1 Thomp. on Neg.. sec.
150; 2 System Leg. Med., 381; 38 Wis., 584; 95 Mo., 169;
61 Md., 74; 27 Am. St. R., 50; 10 Am. St. R., 60. *As to
degree of care a carrier must exercise to protect passenger
from ill treatment of fellow-passenger:* 1 Joyce on Dam.,
sec. 357; 5 Ency., 2 ed., 553; 3 Thomp. on Neg., 544;
Hutchison on Carriers, sec. 548; 38 L. R. A., 431; 17 Am.
R., 504; 76 Penn. St., 510; 18 A. & E. R. Cas., 386; 54
L. R. A., 943; 64 S. C., 326; 32 Am. St. R., 87; 57 Me.,
202.

May 8, 1906. The opinion of the Court was delivered by

Mr. Justice Woods. Plaintiff recovered a judgment of
$25,000 damages against defendant, arising out of its alleged
failure to protect her while a passenger on its railroad, be-
tween Greenville and Atlanta, from the indignity which she
averred she suffered from a fellow-passenger, in putting his
arms around her and taking other liberties with her person,
against her will, and using indecent language in her presence.
While the exceptions are numerous, the appeal really involves
only five questions.

1. The defendant having admitted ownership of the rail-
road under a charter obtained from the State, it could not
escape liability on the ground that the tort, if any, was com-

mitted by another corporation actually operating the road, and evidence on that point was properly excluded as irrelevant. This question has been recently settled after full argument in *Smalley* v. *A. and C. A. L. Ry. Co.,* manuscript, overruling *Pennington* v. *Ry. Co.,* 35 S. C., 439, 18 S. E., 452.

2. As an important element of her damages, the plaintiff offered testimony to prove that the alleged indignities and a fall received in the car while moving her seat to escape the annoying advances had brought on an illness which resulted in a miscarriage and great suffering. In rebuttal the defendant proposed to introduce a record of the Grady Hospital, purporting to contain a statement made by the plaintiff, when entering that institution for treatment, about four years before this illness, and the history of her case while there. The record was produced by Dr. Johns, who testified it was made by him as one of the hospital physicians. As we understand, the defendant contends this record would have tended to prove that, according to her own statement then made, the plaintiff's physical condition was such as to make miscarriage probable without any such shock and excitement as are here alleged. According to the evidence of Dr. Johns the record as made by him contains these words: "Discharged cured April 27, '99." When produced in Court the record showed an interrogation point had been placed after the word "cured" and the words "(3-32 We uranalysis sp. gr. 1019 acid, neg. M.)" had been inserted near the end of the record. These changes, it appears, were not made by Dr. Johns or any other physician of the hospital, and the defendant offered no evidence to account for them. To have effect as independent proof of the facts stated in it, a paper must speak in its integrity of all that it contains. As there were alterations appearing after the record was made, before the defendant could have the benefit of the record as proof in itself of its contents, it was incumbent upon it to satisfactorily explain these alterations. This the defendant was unable to do and the Circuit Court

did not err in excluding the paper as record evidence. *Kennedy* v. *Moore*, 17 S. C., 466.

3. But the Circuit Judge held further, that Dr. Johns could not as a witness speak from this record made by him as to the statements of plaintiff there written down concerning her physical condition and as to the hospital history of her case, unless after refreshing his memory he could testify to those things as facts within his memory independent of the record. When a witness testifies to making a record at the time of the transaction, and that he would not have made it if it had not been true, this is a sufficient basis for him to testify as to the facts as they appear in his record though he may not be able to recall these facts to his memory. The rule is thus stated in *Bank* v. *Zorn*, 14 S. C., 444, 450: "The rule upon this subject, in its broadest outline, embraces two classes of cases: first, where the witness, after referring to the paper, speaks from his own memory, and depends upon his own recollection as to the facts testified to; where he relies upon the paper and testifies only because he finds the facts contained therein. In the first class, the paper is always permitted to be used by the witness without regard to when or by whom made. In the second class, this rule of admission is much more stringent. In fact, it cannot be used unless it be an original paper made by the witness himself, and contemporaneously with the transaction referred to." *State* v. *Rawls*, 2 N. & Mc., 331; Greenleaf on Evidence, 439b.

As we understand the counsel for respondent did not dispute this general rule of evidence, but insisted that in the application of the rule Dr. Johns did not sufficiently establish the verity of his record to warrant the use of it by him in this testimony; and they further contend the evidence was irrelevant and immaterial. We cannot agree to the view that Dr. Johns did not swear with sufficient clearness to the verity of the record as made by him, for he distinctly testified more than once that while he could not recall to his memory the statement imputed to Mrs. Franklin in his record, yet he

22—74

knew he made it so far as it was in his handwriting, and
that he would not have written down the statement if it had
not been made by the plaintiff at the time.

As the case is to go back for a new trial it will be safer
to say without discussion that we think this evidence rele-
vant, and it was material because not in agreement with some
of the evidence of plaintiff on the same point as will appear
by reference to parallel columns incorporated in the opinion
of the Chief Justice. For instance, Mrs. Franklin denied
saying she had taken bromides and opiates to prevent mis-
carriage, that statement being attributed to her by Dr. Johns.
All evidence tending to show that miscarriage was not im-
probable, without the fall and indignities which plaintiff
testified she suffered on the train, was important to the de-
fendant; especially was this so in view of the fact that the
conductor and the other employees of the defendant on the
train, testified there was no fall and no indignities from a
fellow-passenger, of which they had any notice, and that they
saw nothing which would require or justify the conductor's
interference in the plaintiff's behalf, until he did inquire her
wishes and conform to them by taking her to another seat,
at the same time warning the man who had annoyed her
not to approach her again.

We think it was, therefore, competent for Dr. Johns to
testify from his record as to the statements made by Mrs.
Franklin to him or in his presence and to his own diagnosis.
It need hardly be said it was not competent for him to testify
from his record as to the diagnosis of any other physician,
because that would be mere hearsay.

4. The Circuit Judge stated explicitly to the jury the
    issues of both law and fact made by the pleadings,
    and we do not see that there was any objection to his
    suggesting to the jury to read over the pleadings in
their room in order to obtain a clear perception of the issues
of fact.

5. The defendant next insists the Circuit Judge erred in
charging the jury, "A common carrier is bound to exercise

as high a degree of care to protect a passenger from the wrong or injury of a fellow-passenger as it is to observe, in order to protect all of the passengers from injury arising from the faulty construction of the railroad track, or the faulty running of the railroad trains." This instruction is well supported by authority. Thompson on Carriers of Passengers, 304; *Simmons* v. *New Bedford &c. Co.,* 97 Mass., 361; *Pittsburg R. R. Co.* v. *Pillow,* 76 Pa. St., 511; *Richmond R. R. Co.* v. *Jefferson,* 32 A. St., 87 (Ga.), and note; *Spohn* v. *R. R. Co.,* 87 Mo., 74; *Louisville & Nashville R. R. Co.* v. *McKenna,* 2 Am. & Eng. R. R. Cases, 114; *Spangler* v. *St. Joseph & G. I. Ry. Co.,* 74 Pacific, 607.

But there are factors which enter into the practical application of the rule of the highest degree of care to the protection of passengers from improper conduct of fellow-passengers which are not present in its application to the carrier's mechanical agencies and its servants. Due regard to known mechanical laws, and the selection of employees are matters within the control of the carrier; but a carrier has only a limited control over passengers on its trains. It has no right to direct their actions, so long as they do not conflict with its rules reasonably necessary for the conduct of its business, or with the correlative rights of the other passengers. Indeed, interference on the part of a conductor with free communication between passengers will be generally regarded as impertinent by those concerned, except when there is a clear violation of the rules of good behavior by one passenger to the annoyance of others. When that moment comes, it is obviously the duty of the conductor to act, but to know the moment until complaint is made by the passenger of annoyance, is often extremely difficult. Ordinarily, any unwelcome advances by one passenger to another may be effectively rebuffed by the passenger himself. In applying the highest degree of care to this duty of protection by the conductor, it is further to be borne in mind, that good conduct and respect among passengers is the rule, and insult

and wrong extremely rare, and that experience has shown that the other duties of a conductor requiring his absence from the car from time to time may ordinarily be performed without risk of injury of one passenger to another in his absence. Hence, it cannot be laid down as a general proposition that the exercise of the highest degree of care for the protection of passengers from each other requires that the carrier should keep a watch over the passengers on its train except over those from whom it has reason to anticipate improper behavior. The rule thus stated in 1 Fetter on Carriers of Passengers, is in accord with practically all the authorities: "Carriers of passengers are not insurers of the entire immunity of their passengers from the misconduct of fellow-passengers or of strangers, any more than they are insurers of the absolute safety of passengers in other respects. Nor can the carrier be held liable for such misconduct on the principle *of respondeat superior,* as in the case of the misconduct of his servants. But although the doctrine is of comparatively recent growth, it is now firmly established that a carrier of passengers must exercise the same high degree of care to protect them from the wrongful acts of their fellow-passengers or of strangers that is required for the prevention of casualties in the management and operation of its train, namely, the utmost care, vigilance and precaution consistent with the mode of conveyance, and with its practical operation. While not required to furnish a police force sufficient to overcome all force when unexpectedly and suddenly offered, it is the carrier's duty to provide help sufficient to protect the passenger against assaults from every quarter which might reasonably be expected to occur, under the circumstances of the case and the condition of the parties; and, having furnished such force, the carrier is chargeable with their neglect in failing to protect a passenger from assaults by strangers. This strict rule of duty must, however, be applied in view of the relation which the carrier sustains to all the passengers, and the circumstances of each particular case calling for its exercise. Knowledge

of the existence of the danger, or of facts and circumstances from which the danger may be reasonably anticipated, is necessary to fix a liability upon the carrier for damages sustained in consequence of failure to guard against it." Here the evidence on the side of the plaintiff was that the conductor told her that the conduct of the passenger, who the plaintiff claimed maltreated her, had been improper towards other females on the same train, but this was positively denied by the conductor, who testified he had no reason whatever to expect misconduct from him. With this vital issue of fact before the jury, the Circuit Judge, in charging the general proposition that a railroad company is bound to keep a watch over passengers on its train. stated too strong a test of the degree of diligence required. True, the Court said in the same connection, "But you see the distinction that exists necessarily between the construction of the road or the running of a train of cars, and the care it must exercise to see that one is not injured by a fellow-passenger. It is bound to exercise as high a degree of care as is consistent with the circumstances in each case; but there is a distinction between the two cases, protecting a passenger from the wrong or injury of a fellow-passenger, and protecting a passenger from injury of a defective road or operating the dead matter which constitutes the railroad track and train. Now, the obligation is upon the railroad company to exercise care in both cases, and as high degree of care as is consistent with the circumstances surrounding each of the respective sources of danger; that is, the human being on the one hand and the railroad track and train on the other hand. And that is the distinction between the degrees of care or responsibility to which the law holds the railroad company, when it is apprised of the possibility or probability of a fellow-passenger to wrong or injure a passenger, and it is bound to exercise as high a degree of care to protect a passenger from the wrong or injury of a fellow-passenger as it is to observe, in order to protect all of the passengers from injury

arising from the faulty construction of the railroad track
or the faulty running of the railroad train."

But we think the jury could not have failed to receive
the impression that the law required of the carrier the keep-
ing of a constant watch over its passengers not only after
having information which should lead it to anticipate mis-
conduct and guard against it, but to maintain such watch
even when it had no reason to expect anything but the good
conduct and courtesy usual among passengers on its train,
in order to obtain information as to the conduct of the pas-
sengers.

For the errors which we have pointed out, the judgment
is reversed and the cause remanded for a new trial.

MR. JUSTICE JONES concurs.

MR. JUSTICE GARY concurs, except in so far as the excep-
tions raising the question numbered "3" in the opinion are
sustained.

MR. CHIEF JUSTICE POPE, dissenting.    The plaintiff,
Suda L. Franklin, in her complaint, alleges that the defend-
ant is and was on the dates hereinafter mentioned a railroad
corporation duly chartered and organized under the laws of
the State of South Carolina, and as such it owned and now
owns a certain railroad extending from the city of Atlanta,
Georgia, through the State of South Carolina, in the county
of Greenville, to the city of Charlotte, and that on the first
of April, 1903, and for many years prior thereto, the said
railroad as such was and is now being operated as a common
carrier of passengers between said points.    That she was a
passenger for hire on defendant's railway train on the first
day of April, 1903, accompanied by her infant daughter,
on her way from the city of Greenville, S. C., to the city
of Atlanta, Ga., and while she was within the limits of the
State of South Carolina one of the two passengers, other
than herself and daughter, on the passenger train, and in

the presence and the knowledge of the conductor of the train, began to insult her by making improper advances to her both by speech and by conduct otherwise. That the conductor did not offer, or attempt by word or by act, to protect her from such conduct. That in her effort to relieve herself from the presence and polluting touch of the passenger, she fell against the seat of the car, which wrought a serious sickness to herself. That she remained on the train until she reached the city of Atlanta, when she was carried to the home of her cousin, Mrs. Hamilton, and that the plaintiff was at that time pregnant and had been so for about six months. That her sickness continued for several days, during which sickness she suffered a miscarriage, which was due to the said mistreatment on the said railroad while a passenger as aforesaid. That her said illness while in Atlanta was so critical that her husband, Howard H. Franklin, was summoned and came to Atlanta to be with her. That in this sickness the plaintiff suffered great agony and excruciating pain, and in her treatment on said railroad train she was shocked, outraged, insulted, humiliated and disgraced. That the defendant is responsible for the said conduct and mistreatment and the said miscarriage, in that it, knowing the foregoing alleged facts as to her mistreatment by another passenger on the train, not only did not protect her, but refused to let her off the train that she might in flight escape further mistreatment. That defendant's conduct through the conductor and other persons in charge of said train on said occasion towards her was negligent, wanton, malicious and wilfully indifferent. Which was to her damage in the sum of fifty thousand dollars, for which sum she prays judgment.

The answer of the defendant admits the statement of paragraph one, but denies that the defendant was at that time a common carrier of passengers, or that it was operating or controlling any railroad cars or trains in the State of South Carolina. "That the defendant has not knowledge or information sufficient to form a belief as to the statement of paragraph two. That the defendant, on information and

belief, denies the statements made in the remaining para-
graphs."

Upon these pleadings the action came on for trial before
his Honor, Judge Klugh, and a jury at the March Term,
1904, of the Court of Common Pleas of Greenville County.
Testimony was offered on both sides. The verdict of the
jury was for the plaintiff for $25,000 damages. Thereupon
the defendant appealed from such judgment on grounds
raising the following questions as stated by appellant:

"1. Was there error in excluding testimony to the effect
that at the time of the alleged injury the defendant was not
operating its railroad as a common carrier, and in charging
that that was an immaterial issue in this case?

"2. Was there error in excluding, as original evidence,
the hospital record?

"3. Was there error in holding that before the witness,
Dr. Johns, could state from the hospital record, (a) what ail-
ment the plaintiff was under treatment for at Grady Hos-
pital; (b) the history of her case as given by her; (c) what
the plaintiff stated to him about her physical condition, he
must, after refreshing his memory from said record, speak
from memory, must remember such facts independently of
the record?

"4. Was there error in imposing upon the jury the duty of
reading the pleadings and determining for themselves the
issues to be decided?

"5. Was there error in charging that a carrier of passen-
gers owes as high a degree of care to protect a passenger
from injury by a fellow-passenger as from injury by reason
of defective construction of tracks or improper management
of trains?

"6. Was there error in charging that a common carrier of
passengers is bound to keep a watch over its passengers to
prevent injury by them to a fellow-passenger?

"7. Was there error in charging that if a company owns
a railroad it is bound by law to operate it."

We will now pass upon the exceptions.

Exception 1. The appellant alleges that the Circuit Judge held that the case of *Davis* v. *Atlanta & Charlotte Railway Co.,* 63 S. C., 370, 41 S. E., 892, was decisive of the question as to the effect upon defendant, who was sued as a *lessor-railway,* when the proof would show that such railway was being operated by a *lessee-railway.* And that under the decisions of this State the *lessor-railway* could be held responsible for damages to passengers or employees although the railroad was being operated at the time by a lessee. The language of the decision is as follows, page 374: "When a railroad or other corporation receives its charter from the State conferring certain franchises, rights and privileges, it is upon the consideration that such corporation shall perform the duties and fulfill the obligations which it at the same time incurs. The fact that the corporation chooses to perform these duties and fulfill its obligations to the community through another, whether by lessee or otherwise, cannot release it from obligations it has assumed by the acceptance of its charter," quoting the following decisions: "*National Bank* v. *Railway Company,* 25 S. C., 222; *Harmon* v. *R. R.,* 28 S. C., 401, 5 S. E., 835; *Parr* v. *R. R. Co.,* 43 S. C., 197, 20 S. E., 1009."

But the appellant alleges, in the first place, that when its answer contained a denial that the appellant, although it admitted that such railway lessor was duly chartered by this State and as such owned such railroad at the time mentioned, the appellant was operating or controlling any railroad cars or train in the State of South Carolina, an issue was tendered by the defendant to the plaintiff; and, in the second place, that the decision of this Court in the case of *Pennington* v. *R. R. Co.,* 35 S. C., 439, 14 S. E., 852, holds that the lessor-railway company is not responsible for any injuries inflicted by the lessee-railway company.

It seems to us that this Court, in *Davis* v. *R. R. Co., supra,* held that testimony tending to show that the Atlanta and Charlotte Railroad Company was not operating its road, but that the lessee, the Southern Railway Company, was oper-

ating the same, thereby excluded such testimony as immaterial. The allegation of the answer was of no avail. So much of the argument of appellant which endeavors to reenforce its position by *Pennington* v. R. R. Co., *supra,* remains to be considered.

The appellant, in the case of *Davis* v. R. R. Co., *supra,* sought to convince this Court that a new trial was proper by relying upon the Pennington case, already cited. It used nearly five pages of printed argument in its argument for a new trial, relying upon the Pennington case, and yet this Court was not convinced thereby. Clearly, this Court showed that the Pennington case was no longer regarded by it as authority, though it did not actually overrule the case. We now formally overrule *Pennington* v. R. R., 35 S. C., 439, 14 S. E., 852.

It may be remarked in this connection that the position that the lessor-company is not responsible for injuries wrought by the lessee-company, even in the case of such injuries by the lessee-company to its employees, is much weakened by adverse authority, as is said in *Hart* v. *Chicago* R. R. Co. et al., 209 Illinois, 414: "Mr. Elliott in his work on Railroads (vol. 2, 610), says that he 'inclines to the opinion that the lessor-company is not so liable when the injuries to the servant of the lessee-company are caused by the negligence of the lessee-company in operating the road,' but this author says that the weight of the authority is against the view that he is inclined to adopt." As remarked by the Court itself in the case just cited, "That in sound reason and as the better public policy, the doctrine should be maintained that the lessor-company shall be required to answer for the consequences of the negligence of the lessee-company in the operation of the road, not only to the public, but also to the servants of the lessee-company who have been injured by the actionable negligence of the lessee-company."

It is true, there is a strong dissenting opinion, in the case of the Illinois Court, in the case cited from the opinion in 209 Illinois, 404. Yet we must remember that in this case

in the Illinois Court, it was an injury wrought by the lessee-railroad to one of its servants, which was sustained by the judgment of the Court as against the lessor-railroad. Both in the majority opinion as well as the minority opinion it was conceded that in the case of a *passenger,* there was no doubt that the lessor-railroad was responsible. See pages 420, 426, 427 of the Illinois case; and on page 427 it is said, "On the principal question, that of the liability of the lessor, the reasoning of the Court of last resort of Texas seems unanswerable. As there suggested, the land owner whose real estate adjoins the right of way; the traveler who uses the highway crossing the railroad track; the shipper of freight, who must have his goods carried over the leased line; *the passenger who finds it necessary to travel over the same line of road,* are all brought into such relations as they occupy with the company operating the trains, without their consent. So far as they are concerned, the lessor has obtained from the State a charter to operate the trains, and then, without the consent of these persons, has substituted another in its stead, to perform the duties and meet the obligations which it assumed by accepting its charter."

The case at bar is the case of a passenger. The lessor-railroad is liable for any damage to the passenger. The appellant must have this exception overruled.

2. It is necessary in passing upon this question that we should see exactly what the record in this appeal presents for our consideration. It seems that in the case at bar the plaintiff, Mrs. Franklin, had been placed in the Grady Hospital, in the city of Atlanta, Georgia, in the year 1899, for treatment for some ailment of a married woman. The witness Dr. Johns was what is called an intern in said hospital, and as such medical adviser it was his duty to make a record for said hospital, showing a history of the patient so far as her physical condition was concerned, also what was the treatment of the patient by the physicians of said hospital, and what was the result of the treatment. The witness Dr. Johns stated in said record that the patient

was discharged from said hospital at the end of her stay therein "cured." The writing therein was Dr. Johns', except that in said record there was inserted in a different ink at that part where she was declared "cured" an interrogation point "?" which was declared by the witness *not to be in his handwriting* and by some one unknown to the witness, and also there appeared in said record the following words: "Kidneys (3-32. We uranalysis sp. gr. 1019 acid, neg. M."), which words were written *not by Dr. Johns* nor by any one known to him. That this paper was preserved in said hospital and that the witness obtained said record from the Grady Hospital just before he came into Court to testify. So the matter was presented to the Court by said witness.

Objection was presented against the introduction of said hospital record. The Court held that it was incompetent. Was this error? We think it was incompetent. As a record, if entitled to introduction, every part thereof should be introduced.

The defendant's witness, in his testimony, said that parts thereof were in his handwriting but other parts thereof were not only not in his handwriting but were in the handwriting of some other person unknown to him. That it was his duty to make up said record, and that he remained as an officer of said hospital for nearly a year and a half after said record was made up and after the discharge of said patient as "cured." Now it must be remembered that this writing called a hospital record is not what is known in law as a record, which in law is given great prominence, such as public acts of the legislature, of a county or a State, a judicial record, of county, &c. These are usually presented under hand and seal of the Secretary of State in the case of public records, or under the hand and seal of clerk of Court as to judgments or decrees. Really what is understood by this "Hospital Record" of the Grady Hospital, is a statement in writing not even indorsed or authenticated by the signature of the officer of said Grady Hospital. There is no solemnity of such a statement, attached thereto by law,

under which the Courts of the county allow it to be introduced in evidence *per se*.

It falls under the head of *written instruments*, and in section 565 of 1 Greenleaf on Evidence, at page 606, it is said: "Though the effect of the alteration of a legal instrument is generally discussed with reference to deeds, yet the principle *is applicable to all other instruments*. The early decisions were chiefly upon deeds, because almost all written engagements were anciently in that form; but they establish the general proposition that written instruments, which *are altered*, in the legal sense of that term, as hereinafter explained, are *thereby made void*. The grounds of this doctrine are twofold. The first of these is that of public policy to prevent fraud, by not permitting a man to take chance of committing a fraud without running any risk of losing in the event it is detected. The other is, to insure the identity of the instrument, and prevent the substitution of another without the privity of the party concerned. The instrument derives its legal virtue from its being the sole repository of the agreement of the parties, solemnly adopted as such, and attested by the signature of the party engaging to perform it. Any alteration, therefore, which causes it to speak a language different in legal effect from that which it originally spoke, is a material alteration."

Unquestionably the Circuit Judge, to whom the question of the competency of the so-called hospital record was submitted, was justified when he held that the same was not entitled to be received, for the same was altered in material points, as was established by the testimony of Dr. Johns himself. This exception must be overruled.

3. Apart from the weakness of the testimony of Dr. Johns as to what ailment the plaintiff was under treatment for at the Grady Hospital, the history of her case as given by her and what the plaintiff stated to him of her physical condition as written down by him in his report of the case, we think the Circuit Judge made no mistake in holding that such testimony was incompetent. We admit that it was

in the power of the defendant to offer in evidence certain testimony by Dr. Johns, under a part of section 115 of 1 Greenleaf's Evidence, page 136, which reads as follows: "It is upon the same ground that *certain entries made by third persons* are treated as original evidence. Entries made by third persons are devisable into two classes: *First,* those which are made in the discharge of official duty, and in the course of professional employment; and *secondly,* mere private entries. Of these latter we shall hereafter speak. In regard to the former class, the entry to be admissible, must be one which it was the person's duty to make, or which belonged to the transaction as part thereof, or which it was its usual and proper concomitant. It must speak only to that which it was his duty or business to do; and not to extraneous and foreign circumstances. The party making it must also have had competent knowledge of the fact, or it must have been part of his duty to have known it; there must have been no particular motive to enter that transaction falsely, more than any other, and the entry must have been made at about the time of the transaction recorded. In such cases the entry itself is admitted as original evidence, being part of the *res gestae.* The general interest of the party in making the entry, to show that he has done his official duty, has nothing to do with the question of its admissibility; nor is it material whether he was or was not competent to testify, it is deemed necessary to produce him. But if he is called as a witness to the fact, the entry of it is not thereby excluded. If the party who made the entry is dead, or being called has no recollection of the transaction, but testifies to his uniform practice to make all his entries truly, and at the time of each transaction, and has no doubt of the accuracy of the one in question, the entry, unimpeached, is considered sufficient as original evidence, and not hearsay, to establish the facts in question."

Let us recall the facts as they appear from the record furnished us in this case by the defendant. It appears after the so-called "Hospital Record" had been refused to be ad-

mitted in evidence by the Circuit Judge, Mr. Cothran, one of the attorneys for the appellant, took the paper (known as hospital record) and said to the witness Dr. Johns: "I believe you stated awhile ago that you made these entries?" Answer: "Yes, sir." Question: "In an interview with Mrs. Franklin?" Answer: "Yes, sir." Question: "Then state Doctor, whether or not the entries you made then were correctly taken down from her statement to you?" Answer: "I can't remember exactly"— Question: "I don't ask you to remember exactly. I ask you if you took down correctly what she said. Don't you know?" Answer: "I can't remember." Question: "I don't ask you to remember. I ask you if you took down that statement. If it had not been made would you have taken it down?" Answer: "No, I would not." Mr. Cothran, addressing the Court: "I submit he has a right to take that paper and state what she said to him." The Circuit Judge denied that right, unless he remembers what she said.

We call attention to the fact that the paper presented to this witness by Mr. Cothran was the same paper which had been ruled out as incompetent. Granted that the question at last propounded to the witness related to only so much of the contents of that paper as was alleged therein to have been given by Mrs. Franklin; the reasons of the Circuit Judge for his refusal to admit the testimony is one thing; the legality of his ruling is another. As before remarked, we hold that he committed no error of law.

*First.* The witness did not admit that he made such statement as coming from Mrs. Franklin while he was acting as an official of the hospital and in the course of professional employment.

*Second.* The law which we have just quoted, required that such entries belonged to the transaction or part thereof.

*Third.* It could not be read to contradict the testimony of Mrs. Franklin, for she never had been asked if she ever made such admission and the testimony was given in relation thereto while examined as defendant's witness.

*Fourth.* The question was incompetent because there was no possible connection between Mrs. Franklin in the Grady Hospital and Mrs. Franklin engaged in a suit for damages against the Southern Railway, unless she had sworn falsely in her testimony.

One of the rules of law as to proposed testimony, is its relevancy. The questions are confided to the Circuit Judge's discretion. Was there any substantial contradiction? Parallel columns will show what Mrs. Franklin admitted and what the statement by Dr. Johns was as to what Mrs. Franklin admitted to him:

| *Mrs. Franklin's Testimony.* | *Hospital Record.* |
|---|---|
| "C." | "D." |
| Had Drs. Hardin and Strickler; don't know anything about Dr. Ernest. Case, p. 96, f. 379. | 3. Service of Drs. Ernest, Hardin and Strickler. |
| 4. Dr. Hardin said she had neurasthenia. Case, p. 96, f. 380 to f. 382. | 4. Diagnosis: Cervixneurathenia. |
| 5. Same operation was performed by, but she didn't know what — no cutting. Case, p. 27, f. 380; also, Case, p. 27, f. 105. | 5. Operation: Trochelarrhaphy. |
| 6. Operator: Dr. Hardin. Case, p. 96, f. 380. Case, p. 27, f. 105. | 6. Operator: Dr. Hardin. |
| 7. (a) Don't think she said that; her health had always been good, but at the time she was not strong, and was very weak. Case, p. 92, f. 364. | 7. Family history, past: (a) Says she was never very strong; but had never had much sickness until last child was born. |
| (b) Had three children, | (b) Has had three chil- |

oldest five and youngest was over one year old. Case, p. 92, f. 366.

(c) Did not say that three weeks before last child was born she fell against table and was in bed till child was born. Case, p. 93, f. 366.

(d) Did not say she was given bromides and opiates to prevent miscarriage. Case, p. 93, f. 367.

8. (a) Did not say that she had no trouble after labor until she got up, when she felt pelvis bone move when she walked. One side hurt her a little. Case, p. 93, f. 367 to f. 368.

(b) Had not been in good health for a year or so. Case, p. 93, f. 369.

(c) Had peritoritus twice. Case, p. 93, f. 369.

(d) Had bladder trouble but no heavy dragging feeling in pelvis. Case, p. 93, f. 370.

(e) Don't remember if she said she had yellowish discharge, but supposed she did if it was on the record. Case, p. 93, f. 370.

(f) Don't remember saying she had some pains in bowels. Case, p. 94, f. 371.

(g) Did not say bowels

dren, oldest five and youngest three.

(c) Three weeks before last child was born, fell against a table and was in bed until child was born.

(d) Was given bromides and opiates to prevent miscarriage.

8. Family history, present:

(a) Says she had no trouble after labor until she got up, when she got up felt pelvis bone move when she walked and gave her pain.

(b) Has never been well since.

(c) Has had what doctors call peritoritus three times.

(d) Had irritable bladder and heavy dragging feeling in pelvis.

(e) Has yellowish discharge from vagina.

(f) Occasional pains in abdomen.

(g) Abdomen sometimes

23—74

would swell up and get very tender. Case, p. 94, f. 371.

(h) Said she was very nervous. Case, p. 94, f 371.

(i) Said she was constipated. Case, p. 94, f. 371.

swells up and gets very tender.

(h) Patient very nervous.

(i) Bowels very constipated.

(j) Kidneys (3-22. We uranalysis sp. gr. 1019 acid, neg. M.)

(k) Appetite: Fairly good.

(l) Tongue slightly coated.

The exception should be overruled.

4. The Circuit Judge was careful in his charge to the jury to fully explain to them the issues raised by the pleadings, but he did use the language alleged by the appellant, telling them to read the pleadings so as to see what were the issues involved. He was careful, however, to impress the jury with their duty to understand what the issues of fact were. He did not omit his duty to charge the jury that his charge upon the law was his duty.

If the Circuit Judge had failed to charge the jury as to what the issues of fact raised by the pleadings were and if, on the contrary, he had simply referred them to ascertain from the pleadings themselves what were the issues involved he would have been in error, but he did not do this. We see no error as here complained of and therefore this exception is overruled.

We will now consider exceptions 8, 9 and 10 in their order as follows:

"8. The Circuit Judge erred in his charge to the jury as follows: 'It (a common carrier) is bound to exercise as high a degree of care to protect a passenger from the wrong or injury of a fellow-passenger as it is to observe, in order to protect all of the passengers from injury arising from the faulty construction of a railroad or the faulty running of the railroad train.' " The foregoing

is a part of the charge itself, and the Circuit Judge in his charge in this connection also said: "It is bound, also, to exercise care to protect its passengers from insult or injury proceeding from the employees of a railroad company or a fellow-passenger. And I may say here what I would ordinarily have said, and that is: there is a distinction between the obligation of a railroad to protect its passengers from accident arising from the construction of the road or from the handling and serving of the train, and the obligation of a railroad company to protect its passengers from injury inflicted by a fellow-passenger. And that distinction arises from the difference between the two. A railroad iron on the track is an inert matter; the railroad is bound to see that whoever constructs the railroad shall keep it in good condition. A passenger upon a railroad train is an animate being, capable of thought and action—all of which is conceived and there comes a distinction.

"It is possible for a railroad company to go and look at a bar of iron and see whether it is in good order or not; it is impossible for a person to look on a human being and read what his thoughts are or what motives are prompting him or which are liable to prompt that human brain into action. That is what the human brain cannot conceive, and yet that places upon the railroad company the obligation to keep a proper and careful lookout for any improper conduct of the passenger. We can only judge of the safety of the bar of iron by inspecting it and can only judge of the danger of injury by watching the conduct and actions in respect to a fellow-passenger; and, therefore, it is bound to keep watch over the passengers on the train. But you see the distinction that exists necessarily between the construction of the road, or the running of a train of cars, and the care it must exercise to see that one is not injured by a fellow-passenger.

"It is bound to exercise as high a degree of care as is consistent with the circumstances in each case; but there is a distinction between the two cases, protecting a passenger from wrong or injury of a defective road or operating the

dead matter which constitutes the track and train. Now, the obligtaion is upon the railroad company to exercise care in both cases, and as high a degree of care as is consistent with the circumstances surrounding such of the respective sources of danger; that is, the human being on one hand, and the railroad track and train on the other hand. And that is the distinction between the degree of care or responsibilities to which the law holds the railroad company, when it is apprised of the possibility or probability of a fellow-passenger to wrong or injure a passenger, and it is bound to observe as high a degree of care to protect a passenger from the wrong or injury of a fellow-passenger as it is to observe in order to protect all the passengers from injury arising from the faulty construction of the railroad track or the faulty running of the railroad train."

But in addition to these observations by the Circuit Judge, he, at the request of the defendant, charged the jury: "3. As between a carrier and a passenger with respect to the act or omission of the carrier and its servants towards the passenger regarding his safety, the law requires the highest degree of care consistent with the carrier's undertaking. This, however, is not the standard by which the carrier's liability to the passenger is to be determined when intervening acts of a fellow-passenger or strangers directly cause the injury. It attaches only when the carrier and its servants could have prevented the injury but failed to intervene to avert it, with knowledge or with facts which should have imparted knowledge that the injury was threatened." And again, in its argument, the defendant admits that as to the conduct of a fellow-passenger or a stranger the rule is this: "Before the carrier can be held liable to one passenger for insult or assault by a fellow-passenger, it must appear that the agent or servants of the carrier either knew of the actual existence of a disturbance and made no effort to quell it, or had knowledge of the presence on board of disorderly or dangerous persons, from whose language or actions there was reasonable ground to apprehend danger and failed to

take any precautions to avert it. Knowledge of the danger, or of facts and circumstances from which danger may reasonably be anticipated, is essential. * * *"

Now, in the case at bar, the tetsimony of the plaintiff is that the conductor of defendant's passenger train told the plaintiff that one of the passengers seated in the same coach as the plaintiff and her daughter, had given him trouble that day with two other ladies; and he also said, "I don't care what he is, he will not reach Atlanta or Kansas City." Then he said to the passenger: "This is the third time since 12 o'clock you have given me trouble, and I will show you you will not give me any more trouble." Passenger said, "You have made that threat before." The conductor himself admitted that he told the passenger, "That lady don't want to be bothered with you any more, and if you attempt to bother her again, I will put you in the ditch and you will not see Arkansas." The allegations of the complaint set up distinctly the misconduct of the passenger to the plaintiff in the presence of the conductor. The testimony was responsive to those issues. Hence it was the Judge's duty to charge the jury as to the duty of the railroad authorities to protect passengers. Not only was this true, but the defendant asked, in its third and fourth requests to charge, that the Judge should so charge the jury. And the Circuit Judge so charged the defendant's request as presented. This exception should be overruled.

As to exception 9, which alleges error in the charge of the Circuit Judge as follows: "When a railroad company is put on notice of facts, that a prudent railroad company would take notice of; that there was danger arising from a fellow-passenger, then the railroad is bound to exercise as high a degree of care to protect its passengers from wrong or injury produced from a fellow-passenger as from injury arising from the construction of the railroad itself, the running of the train and other matters of that kind."

The defendant admits, "That the railroad, under such circumstances, is chargeable with ordinary care to protect the

threatened injury"—but it suggests that the Circuit Judge was in error when he held that such railroad was subject to the same rule in order to avoid the conduct of the fellow-passenger as it would be in case of faulty construction of the railroad itself. When the whole charge is regarded, there seems to be no infringement of the rule of law in this charge. The defendant, in its fourth request to charge, stated: "A railroad company is liable to its passengers for an injury by a fellow-passenger only when the conduct of this passenger has been such before the injury as to induce a reasonably prudent and vigilant conductor, or other officer, to believe that there was reasonable ground to apprehend violence and danger to other passengers, and in such cases it is the duty of the conductor to use all reasonable means to prevent such injury, and if he neglects his duty the company is responsible, but otherwise not." The Circuit Judge made this charge as here requested. Surely, the Circuit Judge should not be blamed where he adopted the very language of the defendant itself. This exception should be overruled.

The 10th exception is as follows: "It (a railroad company) can only judge the danger of the injury from a fellow-passenger by watching the conduct and the actions in respect to a fellow-passenger; and, therefore, it is bound to keep a watch over the passengers on the train." This exception is but a short quotation from the general charge of the Circuit Judge, and when it is weighed along with other portions of the charge, it will be found utterly unobjectionable. What he meant was, that when the conduct of the fellow-passenger was known by the conductor to be vicious, as the testimony showed in the case at bar in exception 8, then the conductor should be on the alert. As the defendant, in the argument of its counsel, admits that the Circuit Judge admitted that there was a difference between cases when injuries to passengers resulted from faulty construction or condition of roadbeds, or other cases where passengers were injured by fellow-passengers. Still, the cases in

our books of reports show that the defendant is liable for injuries when the conductor, or other servant, is negligent when he knows the bad conduct of a fellow-passenger beforehand, and adopts no precautions to protect his passengers. As was said by Chief Justice Gibson of Pennsylvania: "Precaution becomes a duty only when there is a reasonable ground to apprehend danger." *Scheffer* v. *R. R. Co.,* 105 U. S., 252; *Tall* v. *Baltimore Steam Packet Co.,* 47 L. R. A., 123; *R. R. Co.* v. *Burke,* 53 Miss., 200; 5 A. E. Encyclopaedia (2 ed.), 553; 6 Cyc., 602. This exception should be overruled.

6. Of course, a railroad company, when its conductor is apprised of the dangerous or vicious conduct of a fellow-passenger to other passengers on the same train, is bound to exercise great care or watch to prevent such dangerous or vicious conduct. In the case at bar, it was in testimony as coming from the conductor, that this same fellow-passenger had already insulted ladies on this train. The moment, therefore, when some of this bad conduct was being manifested by this bad fellow-passenger, the conductor was bound to the exercise of great care to protect his passengers therefrom. It would be a sad day for our people when passengers, especially women, can run the risk of negligence on the part of conductors on such trains in failure to protect them from the vicious. This exception should be overruled.

7. The charge here complained of is of no practicable moment. The lessor-railroad had confided its railroad to a railroad-lessee, so, therefore, what injury could result to the lessor-railroad by saying it was under the law obliged to operate its railroad? This exception is overruled.

In my opinion, it should be the judgment of this Court, that the judgment of the Circuit Court be affirmed.