## 10070

### OXNER v. SEABOARD AIR LINE RY. CO. .

(96 S. E. 559.)

1. MASTER AND SERVANT—INDUCING SERVANTS TO LEAVE EMPLOYMENT—EVIDENCE.—Evidence, in an action in tort for enticing away servants under contract with plaintiff, *held* sufficient to sustain a verdict for plaintiff.

2. MASTER AND SERVANT—ENTICING AWAY SERVANTS—EVIDENCE—ADMISSIBILITY—PUNITIVE DAMAGES.—In an action for damages for enticing away servants under contract with plaintiff, evidence tending to prove that the method used in obtaining laborers was in accord with defendant's general policy, a policy condemned by law and sound morals, is admissible to justify punitive damages.

3. MASTER AND SERVANT—ENTICING SERVANTS TO LEAVE EMPLOYMENT.—In an action for punitive damages for enticing away servants, a pass given by the defendant railroad to its employment agent, prior to the employment of plaintiff's servants, and attempted to be used subsequent thereto, was admissible as tending to prove guilty knowledge and intent of defendant's agent, as well as defendant's general policy of interfering with laborers, known to be under contract with others.

4. APPEAL AND ERROR—HARMLESS ERROR—READING OF CRIMINAL STATUTE TO JURY.—In a civil action for damages for enticing away laborers, under contract with plaintiff, for work in another State, Cr. Code 1912, sec. 896, making it a misdemeanor to carry on the business of emigrant agent without a license, is not wholly irrelevant, where a violation of such statute is pleaded, and the reading of such statute to the jury was not error prejudicial to the defendant.

Before MAULDIN, J., Laurens, Fall term, 1917. Affirmed.

Action by M. W. Oxner against the Seaboard Air Line Railway Company. Judgment for plaintiff, and defendant appeals.

*Messrs. Dial & Todd* and *J. L. Glenn,* for appellant. *Mr. Glenn* cites: *As to error in Judge's charge by reading to the jury: Sec.* 896 of the Criminal Code of 1912; 108 S. C. 256; 65 S. C. 60; 136 U. S. 104; 84 Law Ed. 390; 39 S. E. 913; 48 S. E. 597; 52 S. E. 140.

*Messrs. Simpson, Cooper & Babb,* for respondent (oral argument).

August 15, 1918.

The opinion of the Court was delivered by Mr. JUSTICE HYDRICK.

This is an action in tort for enticing away laborers under contract with plaintiff. From judgment for plaintiff for $1,000 actual and $1,500 punitive damages, defendant appeals.

Plaintiff alleged that, on April 22, 1917, defendant's agents wilfully solicited and persuaded four of his laborers—Walter Johnson, Wash Hunter, Charley Summers and Rush Byrd—who were known by said agents to be under contract with him to perform farm labor for him during the year 1917, to leave his employment and go to North Carolina to work for defendant; that, in violation of plaintiff's rights and the laws of this State, defendant solicited, induced and persuaded said laborers to leave him and go to North Carolina to work for defendant by furnishing them free transportation on defendant's railroad, and that such was defendant's general policy in obtaining labor. The answer was a general denial.

As the exceptions assign error in the admission of testimony and the refusal of a motion for a directed verdict, we state the substance of the testimony:

Walter Johnson: I was under contract with plaintiff for 1917. On April 22d, I saw Grant Robertson, at Kinards. He knew that I was under contract with plaintiff. In consequence of a conversation with him, I saw the other hands of plaintiff, and we all waited until after night, so that we could go off without being seen; went to defendant's station at Clinton, where Robertson said there would be a man on board the midnight train going north with a pass, on which we would be carried to Hamlet, N. C., and found the man on board with a pass. He did not tell his name, but when the conductor came through, he told him to tag us, and the conductor did so, and we were carried on his pass. Grant Robertson was working for the defendant, getting up laborers, and had been doing so about three years. Was employed by him in 1916 to work for defendant, and went on a pass furnished by him. He doesn't do anything but go around and get hands for defendant and send them off on passes. He asked me if I knew where he could get some hands to go off on the railroad to work, and offered 95 cents a day and board, or $1.20 a day without board, and free transportation. I worked under Joe Harrelson, an extra foreman of defendant's. He told me he wanted me to get him some men, and gave me a pass for myself and ten men. The pass was dated April 11, 1917, and made out to Morris Harman and ten men, and was good on defendant's road from Atlanta, Ga., to Aberdeen, N. C. Morris Harman had been working for defendant, but Harrelson gave me the pass, and the name, Morris Harman, and said if I was caught, my name would not be on the pass. I came to Kinards on that pass, and was trying to get hands to take back on it, when I was arrested. I was convicted and sentenced to 12 months on the chain gang. Did not use the pass. They caught me before I could use it. I gave it to Walter Williams, and he

threw it down on the railroad, and Mr. Wertz (the witness by whom it was produced) went and got it.

Rush Byrd: Was under contract with plaintiff for 1917. Left April 22d, and went to Hamlet, N. C., to work for defendant. Saw two colored men in automobile at Kinards that day. They asked me if I wanted to go off and work on railroad, and offered $1.30 a day. Said I would go, if they would carry me. They said there would be a man on the midnight train with a pass, Walter Johnson. I and the others went to Clinton that night, and were carried on pass to Hamlet, N. C.

Charley Summers and Wash Hunter testified in substance the same as Rush Byrd.

Walter Williams: Know Walter Johnson. Saw him about May 27th. He gave me that pass (the one above mentioned, issued to Morris Harman and ten men). I would not take it and threw it down on the railroad. Afterwards went back and got it and gave it to Mr. Wertz.

From the foregoing statement of the evidence, it is apparent that there was no error in refusing to direct a verdict for defendant. There was ample evidence to sustain the verdict. There was testimony tending to prove that defendant's agents knew that the men whom they enticed away were under contract with plaintiff, and they showed guilty knowledge by advising them to go off at night, so that they would not be seen and arrested by the police, as the witnesses said.

The suggestion and advice of Harrelson to Walter Johnson also shows a guilty intent and an indifference to the rights of others. If the laborers were to be employed in a legitimate way, it would have made no difference that Johnson was caught doing it. The evidence as a whole tends to prove, what plaintiff alleged, that this method of obtaining laborers was in accord with defendant's general policy, a policy which is condemned by the law as well as sound

24—110.

morals, and one which justifies the infliction of punitive damages. *Duckett v. Pool,* 34 S. C. 311, 13 S. E. 542.

For the reason already stated there was no error in admitting the pass given to Walter Johnson. Although it was of prior date to the employment of plaintiff's hands and was attempted to be used at a subsequent date, it tended to prove guilty knowledge and intent on the part of defendant's agents, and defendant's policy of interfering with laborers known to be under contract with others. Both prior and subsequent as well as contemporaneous events may throw light upon the main fact in issue. The testimony of Johnson and Williams about the pass was relevant and competent. When punitive damages are sought, the jury are entitled to have laid before them all the facts and circumstances surrounding the transaction, in order that they may adequately punish the wrongdoer. *Pickens v. Railroad Co.,* 54 S. C. 498, 32 S. E. 567.

The last assignment of error is in reading to the jury section 896 of the Criminal Code, which makes it a misdemeanor, punishable by fine or imprisonment, to carry on the business of emigrant agent in the State without a license. The statute defines an "emigrant agent" to be "any person engaged in hiring laborers, or enticing emigrants to be employed beyond the limits of the State." While the reading of that section might very well have been omitted, as it had very little relevancy to the case, it was not wholly irrelevant, because plaintiff had alleged that, in enticing away his hands, defendant had not only invaded his private rights, but had violated the law of the State, and thereby showed a contempt for the law of the State as well as the plaintiff's right. It also explained why one of plaintiff's witnesses was then serving a term on the chain gang. We do not think the mere reading of the statute, under the circumstances, was prejudicial to defendant. In *Duckett v. Pool, supra,* the trial Judge charged the jury that it was contrary to the statute to entice away a servant known to

be under contract with another.    There was, in fact, no such statute.    But the error was held to be harmless, because such · enticing was a violation of the common law.

Judgment affirmed.

MR. CHIEF JUSTICE GARY and MESSRS. JUSTICES WATTS and FRASER concur.

.    MR. JUSTICE GAGE did not sit.